**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RAYMOND W. BISHER** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 22-2094**[1] |
| | : | |
| **NATIONAL RAILROAD** | : | |
| **PASSENGER CORPORATION (AMTRAK)** | : | |

**McHUGH, J.** **September 2, 2026**

## MEMORANDUM

This case involves age and disability discrimination claims, combined with an alleged violation of the Family and Medical Leave Act (FMLA). Plaintiff is Raymond Bisher, a former employee at Amtrak, whose employment was terminated at age 55. Amtrak denies discrimination and contends that it fired Mr. Bisher for violating its attendance policy. Having reviewed the record, Mr. Bisher's claim that Amtrak fired him because he suffers from anxiety fails because the decision-makers responsible for his termination did not know about his medical condition. Mr. Bisher's claim that Amtrak fired him due to his age likewise fails because he cannot point to specific instances of age discrimination nor identify younger comparators that received better treatment. Mr. Bisher's FMLA claims are similarly deficient because, as to retaliation, he cannot show causation, and as to interference, he was not denied FMLA leave. I am therefore compelled to grant Amtrak's motion for summary judgment.

[1] This action was reassigned to my docket on August 10, 2026. ECF 32.

## I. The Factual Record

### A. Amtrak's Medical Leave and Absences Policy

Amtrak's Medical Leave and Absences Policy permits qualified employees to take leave in accordance with the FMLA. Warner Decl. ¶ 3, ECF 26-2, Ex. 1. The policy provides for continuous and intermittent leaves of absence for serious health conditions and other purposes as defined by that statute. *Id.* Employees can request FMLA leave by contacting Amtrak's Leave Management Department. *Id.* ¶ 4.

Amtrak's FMLA Policy provides that employees must notify their supervisor at least 30 days in advance of the need for leave if such need is foreseeable. *Id.* ¶ 5. If 30 days' notice is not possible, the employee must provide notice as soon as the need for leave becomes foreseeable. *Id.* The FMLA Policy further provides that employees must comply with their department's normal call-in procedure unless they are unable to do so. *Id.* ¶ 6. Absent unusual circumstances, when an employee fails to comply with their department's standard procedures for reporting absences and requesting leave, Amtrak may delay or deny the employee's leave request. *Id.* If the employee fails to give proper notice, Amtrak's National Attendance Policy will then govern absences. *Id.* ¶ 7.

When determining the start date for an employee's FMLA leave, Leave Management analysts ask a list of questions designed to assist them in identifying the appropriate start date, including: (1) the approximate date the medical condition commenced, if it began within the past 15 days; (2) the date the employee was admitted to the hospital for an overnight stay, if that date falls within the past 15 days; (3) whether the medical condition is a pregnancy; (4) whether the employee will be on leave for a continuous period of time; and (5) whether the employee needs part time or a reduced work schedule, and if so, this date can be used if within the last 15 days. *Id.*

¶ 9. If none of these five potential start dates apply, the analyst uses either the date the employee requested FMLA leave or the date the employee's healthcare provider signed the required FMLA paperwork. *Id.* ¶ 10. For intermittent leave, Amtrak backdates leave up to 14 days. *Id.* ¶ 11. Plaintiff Raymond Bisher does not dispute this description of Amtrak's system.

**B. Bisher's Employment at Amtrak**

Bisher began working at Amtrak on May 17, 1990. Statement of Undisputed Material Facts (SUMF) ¶ 14, ECF 26-1; Pl.'s Dep. 24:19–24, ECF 26-1, Ex. A. From 2016 to October 2020, Bisher was a "Red Cap," assisting passengers on and off Amtrak's trains at 30th Street Station. SUMF ¶¶ 16–17; Pl.'s Dep. 48:9–24. Starting in 2015, Lead Station Manager Therese Drew became Bisher's supervisor. SUMF ¶ 18; Pl.'s Dep. 108:11–19. Drew reported to Assistant Superintendent Richard Funk, who, in turn, reported to Superintendent Michael Jerew. SUMF ¶¶ 19–20.[2]

During his employment with Amtrak, Bisher was a member of the Transportation Communication International Union (TCU). Buck Decl. ¶ 2, ECF 26-8. The collective bargaining agreement (CBA) between Amtrak and the TCU governs the discipline of TCU members, including termination. SUMF ¶ 24; Buck Decl. ¶ 2. This disciplinary process is usually progressive in nature, with the ordinary steps including "first" and "second" levels of handling, a final warning, and termination. SUMF ¶¶ 31–32. These guidelines do not mandate a particular

[2] All were contemporaries of Mr. Bisher. At her deposition on March 23, 2023, Drew testified that she was 59 years old, which means she was 56 years old when Amtrak terminated Bisher in November 2020. Drew Dep. 81:8–9, ECF 26-3. At the time he signed his declaration on September 22, 2023, Funk was 57 years old, which means he was 54 years old when Amtrak terminated Bisher in November 2020. Funk Decl. ¶ 3, ECF 26-6. At his deposition on July 12, 2023, Jerew testified that he was 58 years old, which means he was 55 years old when Amtrak terminated Bisher in November 2020. Jerew Dep. 7:11–12, ECF 26-7.

sequence, however. Amtrak may issue lesser discipline or proceed directly to termination based on the infraction's severity or the employee's disciplinary record. *Id.* ¶ 32; Buck Decl. ¶ 11; Funk Dep. 43:1–4, ECF 26-5.

**C. Amtrak's National Attendance Policy and Call Off Process**

Amtrak maintains a National Attendance Policy that outlines the minimum standards of attendance for all employees covered by a CBA. SUMF ¶ 63; Nat'l Attendance Pol'y, ECF 26-1, Ex. 7. An employee violates this policy by accruing three occurrences in a 30-day period, five occurrences in a 90-day period, or eleven occurrences in any 12-month period. SUMF ¶ 64; *see* Nat'l Attendance Pol'y. An employee can accrue an occurrence for arriving late, leaving early, or failing to show up for their scheduled work shift. SUMF ¶ 65; Jerew Dep. 40:8–12; *see* Nat'l Attendance Pol'y. But employees do not accrue an occurrence if their absence or lateness is covered by an approved leave. SUMF ¶ 66; Jerew Dep. 40:16–21.

All Amtrak employees receive a five-minute grace period if they arrive late to work. SUMF ¶ 67; Pl.'s Dep. 113:5–8; Drew Dep. 20:20–24. But if an employee is more than five minutes late, the employee accrues an occurrence, and the five minutes are included when determining how late the employee arrived. Drew Dep. 21:1–2, 75:11–15. If an employee cannot come to work, they must call in and "mark off" at least two hours before their shift starts, leaving their name, employee number, and designated shift. SUMF ¶ 71; Pl.'s Dep. 113:5–23. Bisher's then-supervisor, Therese Drew, testified that if an employee calls off work due to an approved leave, including those related to disability or FMLA, the employee should state the absence is related to an approved leave to avoid accruing an occurrence. SUMF ¶ 71; Drew Dep. 55:9–17. Despite knowing he had to notify his supervisor if he was going to be absent due to his disability,

Pl.'s Dep. 88:19–23, when Bisher called off work, he did not cite the reason; instead, he left only his name, employee number, and designated shift time, *id.* 115:3–25.

Bisher seeks to create an issue of fact over whether Amtrak "relaxed" its attendance policy during the COVID-19 pandemic in 2020. He alleges that it did, principally relying on the written statement of Jennifer Bohn, a Red Cap who worked at 30th Street Station during that time, and selectively citing one excerpt from Drew's deposition testimony. Pl.'s Opp'n Br., ECF 28-4 at 11–13; Pl.'s Counterstatement of Facts ¶¶ 6–10, 12–13, ECF 28-1; Bohn Decl. ¶ 7, ECF 28-3, Ex. 19. In her statement filed with Bisher's opposition, Bohn represents that during the COVID-19 shutdown in 2020, "my managers also informed my coworkers and I that . . . there would be no progressive discipline regarding the attendance policy and that no one would be discharged for violating the attendance policy," and that she covered for employees who called out or left work early without any of those employees being disciplined under the policy. Bohn Decl. ¶¶ 7–8. In an exhibit attached to his opposition, Bisher seeks to buttress this, citing testimony from Bisher's immediate supervisor Therese Drew, who initially answered "yes" to the question: "during that first nine months to a year, were attendance policies relaxed at 30th Street Station?" Drew Dep. 29:21–24, ECF 28-2, Ex. 4. Conspicuously absent from this exhibit, however, is Drew's subsequent explanation of what this meant: that during the pandemic, Amtrak instructed employees that if they were "sick or felt symptoms" related to COVID-19, "they should take heed and see their doctor or . . . not report to work," and to "follow up with our medical department." Drew Dep. 30:4–22, ECF 30-1.

Drew's explanation that relaxation of the policy applied only to COVID-19 cases mirrors the deposition testimony of Amtrak's management-level employees, each of whom stated that the company did not "relax" or modify the attendance policy generally during the pandemic. Rather,

they explained, Amtrak allowed employees who tested positive for COVID-19 or displayed related symptoms, and whose absence from work was related to the virus, to report this absence to Amtrak's medical group so that it would not be treated as an occurrence and the employee would be placed on paid COVID-19 leave. Funk Dep. 20:2–17; Jerew Dep. 21:4–16; Richtarich Dep. 56:4–12, ECF 26-9; Buck Dep. 67:1–20, ECF 26-10. They were unanimous that Amtrak's attendance policy otherwise remained in effect during the pandemic. SUMF ¶ 76.

**D. Bisher's FMLA Leave of Absence History**

Mr. Bisher has suffered from anxiety intermittently since 2012. *Id.* ¶ 34; Pl.'s Dep. 71:8–15. Between 2015 and his termination in November 2020, Amtrak granted all of Bisher's requests for intermittent leaves of absence under the FMLA due to his anxiety. SUMF ¶ 35. Each time Bisher requested intermittent FMLA leave, he followed the same process: he contacted Amtrak's Leave Management Department requesting the required FMLA paperwork, brought the paperwork to his physician to fill out, and returned the paperwork to Leave Management. *Id.* ¶¶ 36–37.

On March 31, 2015, Bisher applied for intermittent FMLA leave by requesting the paperwork from Leave Management. *Id.* ¶ 40. On April 8, Amtrak received the completed paperwork from Bisher's physician, which was dated April 1. *Id.* ¶ 41. The paperwork noted that Bisher's medical condition began on March 9. *Id.* ¶ 42. On April 24, Amtrak approved Bisher's leave for the period spanning April 1, 2015, to March 31, 2016, designating April 1 (the day the physician signed the paperwork) as the start date. *Id.* ¶¶ 42, 45–46; Warner Decl. ¶ 15, Ex. B.

Bisher's May 31, 2017 intermittent leave request followed the same sequence. SUMF ¶ 47. On June 20, Amtrak received the completed paperwork and approved his request ten days later for the period covering May 31 to June 26, 2017. *Id.* ¶¶ 48–49. Later, on October 20, Amtrak sent Bisher an FMLA Eligibility Notice based on his absence on September 1. *Id.* ¶ 50; Warner

Decl. ¶ 15. Amtrak received the completed paperwork from Bisher's physician on November 8 and approved his leave on November 15. SUMF ¶¶ 51–52. Per its guidelines, Amtrak backdated Bisher's leave to start on October 6—14 days from the date he requested FMLA leave. *Id.* ¶ 54.

On April 12, 2019, Amtrak sent Bisher another FMLA Eligibility Notice based on his absence on March 26, 2019. *Id.* ¶ 55. Amtrak received the completed FMLA paperwork on May 8 and approved Bisher's intermittent leave request two days later. *Id.* ¶¶ 56–57. Amtrak did not backdate Bisher's leave; instead, it set the start date as the date on which it received the paperwork. *Id.* ¶¶ 57, 59. Bisher's final intermittent leave before the events underlying his termination ended on May 7, 2020. *Id.* ¶ 57. He did not request FMLA leave again until October 21, 2020, after Amtrak notified him that it had initiated termination proceedings against him for violating the attendance policy. *Id.* ¶ 62; Pl.'s Dep. 98:17–21. Drew and Funk were copied on at least some of Bisher's FMLA leave approval letters. *See, e.g.*, ECF 26-1, Ex. 15 & 28. Those letters did not mention Bisher's anxiety; rather, they noted the leave was for a "serious health condition." *Id.*

**E. Bisher's Disciplinary History, Attendance Violations, and Final Leave Request**

During his employment with Amtrak, Bisher received warnings and discipline for violating company rules, including for attendance policy violations. SUMF ¶ 77; Pl.'s Dep. 120:5–8. On April 11, 2019, Amtrak charged Bisher with violating the attendance policy because he accrued more than three occurrences within a 30-day period. SUMF ¶ 81. During the relevant period, Bisher did not have approved FMLA leave. *Id.* ¶ 83; Pl.'s Dep. 100:7–15, 102:1–20; Notice of Intent to Impose Discipline, ECF 26-1, Ex. 16. On May 1 of that year, Bisher signed a waiver of the charges brought against him, accepting a three-day suspension as his discipline. Funk Decl. ¶ 11; Pl.'s Dep. 110:4–117:6; Voluntary Waiver of Hr'g, ECF 26-1, Ex. 16.

On June 28, 2019, Bisher emailed Drew to inquire about his recent occurrences. SUMF ¶ 85; Bisher Email to Drew, ECF 26-1, Ex. 17. Drew responded to that email on July 2, listing the occurrences that Bisher accrued in May and June of that year, followed by this word of advice:

> Please remember, you've been given approval for FMLA 1 day per week for 8 hours per episode, however you are not always citing this as your reason when calling. I checked the sheets and neither of these dales [*sic*] indicated you were using FMLA as the reason. Ray, please remember, to ensure you don't receive any unnecessary occurrences and/or charges it is in your best interest to state just that to the person taking the call or on the call-off line when calling advise you'll be late or marking off. Going forward please continue to cover yourself to avoid being dinged.

Drew Email to Bisher, ECF 26-1, Ex. 17; Drew Decl. ¶¶ 5–6. However, even after receiving Drew's email, Bisher did not cite FMLA as his reason for calling off because he believed "it was not required." Pl.'s Dep. 115:3–25, 116:15–19. At her deposition, Drew testified that she did not know Bisher had anxiety nor the reasons why he took FMLA leave. Drew Dep. 59:5–23.

On August 23, 2019, Bisher received a written warning for violating the attendance policy because he did not call off at least two hours before for his shift on August 13. SUMF ¶ 88; Aug. 23, 2019 Written Counseling Notice, ECF 26-1, Ex. 18. About a year later, on August 11, 2020, Bisher received a verbal warning for violating the attendance policy. Aug. 11, 2020 Verbal Counseling Notice, ECF 26-1, Ex. 20; Drew Dep. 71:15–19; Drew Decl. ¶ 9, Ex. 1. Bisher's intermittent FMLA leave had expired three months earlier on May 7, 2020. SUMF ¶¶ 57, 91; Pl.'s Dep. 98:9–21. Between July 1 and August 8, 2020, Bisher arrived late to work nine times and did not cite FMLA leave nor report that his late arrivals were due to a medical condition. SUMF ¶ 92; Drew Decl. ¶ 8. On September 9, 2020, Drew emailed her supervisor, Assistant Superintendent Richard Funk, informing him that Bisher had accrued three occurrences since receiving the verbal warning on August 11. Drew Email to Funk, ECF 26-1, Ex. 21; Drew Dep. 74:16–75:25; Pl.'s Dep. 135:4–136:19. Two days later, Amtrak issued Bisher a written warning for those attendance

violations, placing him at the termination level within the CBA's progressive discipline system. Sept. 11, 2020 Written Counseling Notice, ECF 26-1, Ex. 22; Pl.'s Dep. 137:25–138:25.

Bisher accrued three more occurrences in September 2020 during which time he did not have approved FMLA leave. SUMF ¶¶ 97–98; Sept. 2020 Attendance Sheet, ECF 26-1, Ex. 23; Pl.'s Dep. 142:5–144:24, 145:2–5. On the day he was absent that month, Bisher called off but did not state that his reason for missing work was due to anxiety or another medical condition. Pl.'s Dep. 143:22–144:14. On October 19, 2020, Assistant Superintendent Funk, as the charging officer, recommended terminating Bisher for violating the attendance policy. Funk Decl. ¶¶ 16–17; Notice of Intent & Formal Investigation for Termination, ECF 26-1, Ex. 24. At that time, Bisher had not reapplied for FMLA leave. Pl.'s Dep. 152:6–8, 154:21–23. Funk testified at his deposition that he "felt bad" about recommending Bisher's termination, Funk Dep. 59:1–4, but nevertheless took that course of action based on Bisher's record of attendance policy violations, *id.* 43:19–21, and "his failure to change his behavior," *id.* 59:19–23, 60:4–5. In addition, Funk stated that, although he knew Bisher had previously taken intermittent FMLA leave, he did not know Bisher suffered from anxiety nor the reasons why he took FMLA leave. *Id.* 43:5–9.

On October 21, 2020, Bisher requested the paperwork to apply for intermittent FMLA leave. Oct. 21, 2020 FMLA Leave Req., ECF 26-1, Ex. 25; Pl.'s Dep. 152:9–11. One week later, on October 28, Amtrak received completed paperwork from Bisher's physician, which indicated that Bisher had been diagnosed with situational anxiety and required intermittent leave. Cert. of Healthcare Provider, ECF 26-1, Ex. 27; Pl.'s Dep. 156:15–21. The paperwork noted that the original start date for the "probable duration" of Bisher's condition was October 22, 2020, to October 23, 2021. Cert. of Healthcare Provider at 175. But that start date was crossed out and replaced with September 10, 2020. *Id.* On November 2, 2020, Amtrak placed Bisher's leave

request under review pending receipt of additional information, including treatment dates from his physician during the previous twelve months. Warner Decl. ¶ 19. Amtrak received that additional information on November 9. *Id.* ¶ 20.

On November 13, 2020, Amtrak approved Bisher's intermittent leave request for the period covering October 14, 2020, to October 14, 2021. Nov. 13, 2020 FMLA Leave Approval Ltr., ECF 26-1, Ex. 28. When determining the period's start date, the Leave Management analyst concluded that none of the five potential FMLA start dates applied. Warner Decl. ¶ 22. So, in accordance with the department's guidelines, the analyst used the date Amtrak received the completed paperwork—October 28, 2020—as the reference point for calculating when Bisher's leave period would begin. *Id.* ¶ 23. Using this date, Leave Management then backdated Bisher's leave request by 14 days from the date it received the completed paperwork, with the start date becoming October 14. *Id.* ¶ 24. Leave Management did not know about Bisher's disciplinary history or pending disciplinary hearing at the time it considered his October 21 leave request. *Id.* ¶ 30.

That same day, Drew and Funk exchanged emails regarding Bisher's FMLA leave request in the following correspondence:

> Funk: "I hope the hearing officer doesn't let this guy off the hook . . ."
>
> Drew: "WOW//Looks like they pushed it back a week; previously it was effective 10/21 . . ."
>
> Funk: "Not enough to cover September occurrences . . ."
>
> Drew: "Yes, that's good."

Nov. 13, 2020 Email Exch., ECF 28-3, Ex. 13.

**F. Bisher's Disciplinary Proceeding and Termination**

On November 11, 2020, Amtrak held a disciplinary hearing on the charges brought against Bisher. Pl.'s Dep. 164:5–23. During that hearing, Bisher testified that he did not apply for FMLA

leave before October 21, 2020, because he could not schedule a doctor's appointment due to the COVID-19 pandemic. *Id.* 165:18–25, 167:5–8, 167:21–23. But when pressed on this issue at his deposition, Bisher acknowledged that he did not need to have such an appointment before requesting the FMLA paperwork and informing Amtrak that he intended to apply for FMLA leave. *Id.* 180:3–14. Given the evidence presented at the hearing, which included the August 11, 2020 verbal warning and September 11, 2020 written warning, as well as testimony from Amtrak management that Bisher violated the attendance policy in September 2020, the hearing officer determined that the charges were proven. SUMF ¶¶ 124–25, 129; Jerew Dep. 31:2–3.

On November 17, 2020, Amtrak sent Bisher a letter informing him about the hearing officer's decision. Decision Ltr., ECF 26-1, Ex. 30. That same day, Bisher called Leave Management and inquired as to why Amtrak did not backdate his leave to September 10, 2020, the date his physician indicated his medical condition began in the FMLA paperwork. Bisher Call Notes, ECF 26-1 at 179–80, Ex. 29; Pl.'s Dep. 172:14–25. On that call, Leave Management representative Janie Kennedy discussed Amtrak Employee Rights and Responsibilities with Bisher, explaining the notice employees must give Amtrak regarding FMLA leave requests and telling him, "they could only go back 14 days." Pl.'s Dep. 173:7–12; Bisher Call Notes at 180.

After reviewing the hearing transcript, Superintendent Michael Jerew contacted Amtrak's Labor Relations Department to confirm that Bisher did not have approved FMLA leave at the time of the September 2020 occurrences that led to the disciplinary charges. Jerew Dep. 19:22–20:17, 27:15–28:7; ECF 28-3, Ex. 13. When Jerew received confirmation from Leave Management, via email correspondence from Senior Director of Labor Relations Aaron Buck,[3] that Bisher did not

[3] Buck testified that in his role, he would not have asked Leave Management whether an employee facing potential discipline had applied for leave or had a disability because "[t]he why doesn't matter to me. All I

have approved FMLA leave at the time of those occurrences, he elected to proceed with Bisher's termination, which took place on November 19, 2020. SUMF ¶¶ 132–34; Buck Dep. 30:12–31:6; Jerew Dep. 20:20–24, 32:1–18, 33:7–34:15; ECF 28-3, Ex. 13; Nov. 19, 2020 Discipline Ltr., ECF 28-3, Ex. 14. At the time of his termination, Bisher was 55 years old. Pl.'s Resp. ¶ 99, ECF 28. Jerew testified that he did not know Bisher had anxiety because such confidential information would not have reached him, Jerew Dep. 18:23–19:4, 28:21–29:6, and he did not learn that Bisher had intermittent FMLA leave until he read the disciplinary hearing transcript, *id.* 19:5–14.

**G. Post-Termination Events**

In accordance with his union's CBA, Bisher appealed his termination to Amtrak's Labor Relations Department. Richtarich Dep. 20:12–22. Senior Manager of Labor Relations Christopher Richtarich reviewed Bisher's appeal. *Id.* 22:24–23. Richtarich testified that when he handles disciplinary appeals, the scope of his review includes only the union's appeal arguments, the disciplinary hearing transcript and exhibits, and the employee's disciplinary record. *Id.* 23:5–7, 24:1–7. Based on his review of the record in Bisher's case, Richtarich denied the appeal. *Id.* 20:3; *see* Pl.'s Dep. 190:20–25. Richtarich further testified that when he denied the appeal, he did not know Bisher had anxiety or any other disability, and he did not learn Bisher previously took FMLA leave until he reviewed the hearing transcript. Richtarich Dep. 48:9–24, 49:10–12, 51:23–52:13.

On November 25, 2020, Amtrak listed Bisher's former position as vacant in the Union Bulletin, where the Chief Assignment Clerk lists vacant positions every week. Funk Decl. ¶ 26. The Union Bulletin instructs union employees to bid for a vacant position, and the most senior

care about is whether or not [the leave] has been approved." Buck Dep. 52:2–8, 53:12–14. In any event, he explained, Leave Management is "very good at not providing private information," *id.* 53:11–12, and does not "go overboard on giving information that really is frankly confidential," *id.* 52:24–53:1.

applicant automatically fills the vacancy. *Id.* ¶¶ 27–28; Pl.'s Dep. 27:19–25. Because of this bid system, Amtrak management does not play a role in filling such vacancies. Funk Decl. ¶ 29. On December 10, 2020, Lamin Fulton (age 55) filled Bisher's former position via the bid process. *Id.* ¶ 33.[4]

Drew, a management-level employee, represents that shortly after Bisher's termination, on December 16, Amtrak terminated a 54-year-old TCU member who, like Bisher, worked at 30th Street Station, for attendance policy violations. Drew Decl. ¶ 15. She further represents that in March and June 2021, Amtrak terminated two younger TCU members, ages 32 and 31, respectively, for violating the policy. *Id.* Bisher has not disputed these representations. In his opposition, Bisher attaches a list of employees at 30th Street Station who were disciplined or terminated for attendance violations between March and December 2020, ECF 28-3, Ex. 15, but the list, which Amtrak produced in a confidential discovery response, does not state the employees' ages, and identifies only one other Red Cap, who had received his first disciplinary action.

### H. The Lawsuit

After his termination, Bisher sued Amtrak, *see* Compl., ECF 1, asserting (1) disability discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*; (2) age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*; (3) identical age and disability discrimination claims under the Pennsylvania Human

---

[4] Bohn claims that after Bisher's termination, Amtrak hired at least three new employees who were all 30 years old or younger, Bohn Decl. ¶ 9, but, as a non-management-level employee, she offers no specifics on when or how they were hired, what their job titles were or to which work location they were assigned, nor how she has personal knowledge of any of these pertinent details. As such, I will not consider this portion of her statement. *See BirckBichler v. Butler Cnty. Prison*, 07-1655, 2009 WL 2986611, at *11 n.13 (W.D. Pa. Sept. 17, 2009) ("The rule is that an affidavit must, at the least, reveal the basis of the affiant's personal knowledge of the facts attested to so as to be competent evidence under the requirements of Rule 56.").

Relations Act (PHRA), 43 Pa. C.S. § 951 *et seq.*; and (4) retaliation and interference claims under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*

## II. Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322–23 (1986).

## III. Discussion

### A. The Railway Labor Act does not preempt Bisher's claims.

As a threshold issue, Amtrak argues that the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (RLA), prevents this Court from deciding the merits of Bisher's claims because their resolution depends on interpreting the CBA. *See* Mot. Summ. J., ECF 25 at 26–29. I disagree. Under the RLA, "minor disputes" between labor and management in railroads and airlines must go to arbitration. *Stouffer v. Union R.R. Co., LLC*, 85 F.4th 139, 144 (3d Cir. 2023). Such disputes involve a plaintiff's effort to enforce rights the parties' CBA created or defined. *Id.* When a claim "depends for its resolution on the interpretation of a CBA," the RLA mandates arbitration on that claim. *Id.* (internal quotation marks omitted). A claim depends on interpreting the CBA when it "may be conclusively resolved by" that interpretation. *Id.* (internal quotation marks omitted). Conversely, "purely factual questions" about an employer's or employee's actions or motives do not require interpreting the CBA and can be decided in court. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 261–62 (1994); *accord Stouffer*, 85 F.4th at 144–45.

Within the Third Circuit, district courts have held that the RLA required arbitration where the plaintiff sought to enforce a right created by (or emanating from) the applicable CBA rather than one conferred independently by statute. *See, e.g., Hamarneh v. United Airlines*, No. 24-5962,

2025 WL 957421, at *4 (D.N.J. Mar. 31, 2025) ("Plaintiff specifically states that his 'due process rights *under his employment contract* were . . . violated[.]'") (emphasis added); *George v. Piedmont Airlines, Inc.*, 761 F. Supp. 3d 804, 811–12 (E.D. Pa. 2025), *aff'd*, No. 25-1064, 2026 WL 1230343 (3d Cir. May 5, 2026) (finding RLA preemption where the gravamen of the plaintiff's claim "emanate[d] from a bonus provision created in LOA 44 and made a part of the parties' CBA.").

In contrast, where plaintiffs challenged the employer's motives in applying the CBA discriminatorily or claimed the employer took adverse actions related to CBA processes based on pretext, district courts have held that RLA preemption did not apply even where resolving the plaintiffs' claims required consulting the CBA. *See, e.g., Bendetsen v. United Airlines, Inc.*, No. 23-1553, 2025 WL 942963, at *6 (D.N.J. Mar. 26, 2025) (concluding RLA preemption did not apply where the plaintiffs challenged United's deviations from its internal processes as pretextual—alleging that United applied them in a manner adverse to senior employees—and reasoning that the plaintiffs' references to sections of the CBA did not suffice on their own to trigger preemption); *Naranjo v. United Airlines, Inc.*, No. 23-1939, 2025 WL 2778504, at *4 (D.N.J. Sept. 30, 2025) ("Nowhere does [the plaintiff] challenge the CBA; rather, she alleges that United used the CBA discriminatorily. She is ultimately 'challenging United's motives in taking adverse action in violation of rights or obligations that exist independently of the CBA.'") (quoting *Bendetsen*, 2025 WL 942963, at *6)); *Prolenski v. Transtar, LLC*, No. 21-545, 2024 WL 1973495, at *6 (W.D. Pa. May 3, 2024) (concluding that the plaintiffs sought to assert a right arising under ERISA and did not argue that any of the CBA's terms violated ERISA or that the defendant improperly applied it to them).

Here, Mr. Bisher alleges that the "real reason Defendant discharged [him] from his long time employment with Amtrak is because of his disability and age. Defendant's discharge was also retaliatory because Plaintiff had previously engaged in protected [FMLA] conduct." Compl. ¶¶ 17, 24. He also asserts that Amtrak applied its attendance policy discriminatorily, tying that assertion back to Amtrak's allegedly pretextual motives. *See id.* ¶¶ 18, 20, 23–24. So, even though references to the CBA's terms "may be relevant" in deciding Bisher's claims, this in and of itself does not strip the Court of subject matter jurisdiction since "a claim is not barred simply because 'the action challenged by the plaintiff is "arguably justified" by the terms of the CBA.'" *Stouffer*, 85 F.4th at 146 (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 833 (7th Cir. 2014)).

Therefore, the RLA does not prevent this Court from resolving Bisher's claims.

### B. Bisher's discrimination claims fail.[5]

Because Bisher proceeds under a pretext theory for his discrimination claims and does not offer any "direct evidence" of discrimination, the burden-shifting *McDonnell Douglas* analysis governs those claims. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 n.4 (3d Cir. 1995) (age discrimination); *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (disability discrimination). Under this analysis, Bisher must first establish a *prima facie* case of discrimination based on his age and disability, respectively. If Bisher fails to do so, Amtrak is

[5] The Court's disposition of Bisher's federal claims applies equally to his PHRA claims. *See Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) ("Since this Court has determined that the interpretation of the PHRA is identical to that of federal anti-discrimination laws, including the ADEA, we present a single analysis for Willis's claims under both statutes."); *see Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) ("[O]ur disposition of Rinehimer's ADA claim applies with equal force to his PHRA claim."). The exception to this approach does not apply because there is nothing "specifically different in [the PHRA's] language requiring that it be treated differently." *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002); *Fasold v. Just.*, 409 F.3d 178, 184 n.8 (3d Cir. 2005).

entitled to summary judgment. For each claim, if he states a *prima facie* case, the burden shifts to Amtrak to "'articulate a legitimate nondiscriminatory reason for the adverse employment action.'" *Willis*, 808 F.3d at 644 (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 412 (3d Cir. 1999)).

*1. Age*

Mr. Bisher claims Amtrak unlawfully terminated him because of his age. *See, e.g.*, Compl. ¶¶ 17, 20, 24. Under the ADEA, an employer may not "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The parties only dispute the fourth element of a *prima facie* case, that is, whether Bisher "was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." *Willis*, 808 F.3d at 644 (citations omitted); *accord Smith*, 589 F.3d at 689. This fourth element can also be established by "showing that the defendant-employer has treated similarly situated, sufficiently-younger employees more favorably." *Steinagel v. Valley Oral Surgery*, No. 12-5645, 2013 WL 5429269, at *6 (E.D. Pa. Sept. 30, 2013) (Gardner, J.); *Dominici v. Reading Hosp./Tower Health*, No. 18-4181, 2020 WL 2898658, at *13 (E.D. Pa. June 3, 2020) (Leeson, J.). To do so, Bisher must demonstrate "that the other employee's acts were of 'comparable seriousness' to [her] own infraction." *Steinagel*, 2013 WL 5429269, at *7 (quoting *Anderson v. Haverford Coll.*, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (Joyner, J.)). The Court does not view this evidence "in a vacuum," but rather views the record as a whole. *See Willis*, 808 F.3d at 646; *Simpson*, 142 F.3d at 645–46.

Bisher argues that he satisfied the fourth element of a *prima facie* case by showing that Amtrak hired three Red Caps after his termination, all of whom were 30 years old or younger. Pl.'s Opp'n Br. at 10–11. He relies on two pieces of purported evidence: (1) Drew's testimony

that "since 2020," Amtrak hired a 25-year-old and 30-year-old to become Red Caps, Drew Dep. 80:19–81:14, ECF 28-2, Ex. 4, and (2) Jennifer Bohn's statement that after Bisher's discharge, Amtrak hired at least three new employees who were all 30 years old or younger, Bohn Decl. ¶ 9. It's unclear when Amtrak hired the younger Red Caps mentioned in Drew's deposition, which occurred in March 2023. Plaintiff's counsel asked Drew how many such employees were hired "since 2020," but their hiring could have occurred at any point during the three years following Bisher's discharge and her deposition, and Bisher does not point to anything in the record to clarify the temporal proximity. Nor does he clarify how these individuals were hired, *i.e.*, whether through the union's bid system or through management's direct participation. This does not suffice to raise a genuine factual issue. Moreover, as noted above, this portion of Bohn's declaration cannot be considered for purposes of opposing summary judgment because she failed to establish the basis of her personal knowledge regarding the younger employees' alleged hiring.

Bisher denies that Lamin Fulton (age 55) was his direct replacement, Pl.'s Opp'n Br. at 11; Pl.'s Resp. at 21, but the record shows that Fulton, who was the same age as Bisher when Amtrak fired him, filled Bisher's former position according to the CBA's bid system for union employees, *see* Funk Decl. ¶¶ 26–29, 33; Pl.'s Dep. 27:19–25. Bisher presents no evidence that under this system, the managers involved in his termination played any role whatsoever in filling his former position. He has therefore failed to show that he was "replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." *Willis*, 808 F.3d at 644.

Even though he cannot show direct replacement, Bisher can still meet the fourth element of a *prima facie* case by presenting evidence of favorable treatment towards similarly situated, substantially younger employees sufficient to raise an inference of age-based discrimination. *See*

*id.* at 645. Bisher, however, has not offered any such evidence to refute Drew's representations that (1) less than a month after Bisher's termination, Amtrak fired a 54-year-old TCU member who also worked at 30th Street Station for attendance policy violations, or (2) that Amtrak fired two TCU members who were in their thirties for the same reason. Drew Decl. ¶ 15. Without evidence of age-related remarks or favorable treatment of younger comparators because of age, Bisher has failed to raise an inference of age-based discrimination.

Because Bisher has not stated a *prima facie* case of age discrimination, I need not analyze whether Amtrak articulated a non-discriminatory reason for Bisher's termination nor whether its reason was pretextual. Amtrak is therefore entitled to judgment as a matter of law on this claim.

*2. Disability*

Mr. Bisher also alleges that Amtrak terminated him because of his anxiety in violation of the ADA, which prohibits discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a); *see, e.g.*, Compl. ¶¶ 17, 24. To establish a *prima facie* case of disability discrimination, Bisher must demonstrate that he (1) has a "disability," (2) is a "qualified individual," and (3) suffered an adverse employment action because of that disability. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006). Only the third element is at issue because Amtrak does not contest whether Bisher's anxiety constitutes a disability under the ADA, *see* 42 U.S.C. § 12102(2), or whether he was a "qualified individual," *see id.* § 12111(8); *see also Turner*, 440 F.3d at 611.

To meet this element, Bisher must show that his disability was "a determinative factor" in Amtrak's decision to terminate him. *See Watson v. Se. Pa. Transp. Auth.*, 207 F.3d 207, 215 (3d Cir. 2000); *Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012). Crucially, "to establish discrimination because of a disability, an employer must know of the disability."

*Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002); *accord Jones v. United Parcel Serv.*, 214 F.3d 402, 406 (3d Cir. 2000).

Bisher argues that he satisfied the third element because (a) the medical certifications included in his FMLA leave applications identified his anxiety, (b) the leave approval letters—some of which copied Drew and Funk—described the effects of his condition, and (c) he surmises, employees in the Labor Relations Department "would have had access" to his FMLA information and "could have passed it along" to Jerew, Funk, and Drew. Pl.'s Opp'n Br. at 13–14.

Bisher's arguments are meritless. First, nothing in the record shows that any of the individuals involved in his termination had access to or saw the medical certifications included in his leave requests, which he submitted directly to Leave Management. Second, the leave approval letters on which Drew and Funk were copied never mentioned anxiety nor stated Bisher was taking leave due to a disability. Finally, Senior Manager of Labor Relations Christopher Richtarich, who denied Bisher's internal disciplinary appeal, and the other managers involved at each stage of his disciplinary process, testified that they did not know about his anxiety nor the reasons for his FMLA leave when they made their respective decisions. Furthermore, Bisher provides no evidence establishing that Buck, Richtarich, or anyone in Labor Relations accessed his confidential FMLA information when he faced potential termination. *See* Buck Dep. 52:24–53:1, 53:11–12; Richtarich Dep. 48:9–24, 49:10–12, 51:23–52:13. Bisher's "theory of imputed knowledge" as to employees in the Labor Relations Department is "based upon sheer speculation" and is not sufficient to raise a genuine issue of material fact. *Ransom-Ellison v. Childs. Hosp. of Phila.*, 826 F. Supp. 3d 616, 626 (E.D. Pa. 2026) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 954 (3d Cir. 1996)).

Thus, without evidence that the decision-makers involved in his termination knew about Bisher's anxiety, his claim fails. *See, e.g., Gardner v. Ulta Salon, Cosms. & Fragrance, Inc.*, No. 21-3422, 2022 WL 3647824, at *6 (E.D. Pa. Aug. 24, 2022) (McHugh, J.), *aff'd*, No. 22-2785, 2024 WL 1110384 (3d Cir. Mar. 14, 2024) ("Without evidence that the decision-makers knew that Ms. Gardner was struggling with depression and mental health challenges, a reasonable juror could not conclude that she was terminated because of her disability."). Because Bisher has not established a *prima facie* case, I need not proceed to the next steps in the *McDonnell Douglas* analysis. Amtrak is entitled to summary judgment on Bisher's disability discrimination claim.

**C. Bisher's FMLA claims fail.**

Mr. Bisher also brings FMLA retaliation and interference claims against Amtrak. Compl. ¶¶ 55–56. As the Third Circuit has articulated,

> [w]hen employees invoke rights granted under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" these rights. Nor may employers "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." The former provision is generally, if imperfectly, referred to as "interference" whereas the latter is often referred to as "retaliation."

*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3d Cir. 2012) (internal citations omitted). Because FMLA retaliation claims require proving the employer's retaliatory intent, courts decide these claims through the lens of employment discrimination law. *Id.* Therefore, where, as here, the plaintiff bases his claim on indirect evidence,[6] the *McDonnell Douglas* burden-

[6] Bisher argues that the November 13, 2020 email exchange between Lead Station Manager Drew and Assistant Superintendent Funk is direct evidence of retaliatory animus towards his protected conduct under the FMLA and, therefore, the framework set forth in *Price Waterhouse v. Hopkins*, 480 U.S. 228 (1989), applies. Pl.'s Opp'n Br. at 9. Not so. Those emails reflect Funk and Drew's concern about Amtrak letting Bisher "off the hook" for his repeated attendance violations, which, notably, Drew expressly cautioned Bisher about well before he faced potential termination, *see* Drew Email to Bisher, ECF 26-1, Ex. 17; Drew Decl. ¶¶ 5–6. And Drew encouraged Bisher to invoke the FMLA when appropriate.

shifting analysis governs. *See Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014). Thus, Bisher must first establish a *prima facie* case of discrimination before the analysis can proceed to the next steps. *Id.* As for retaliation, he "must point to evidence in the record sufficient to create a genuine factual dispute about each of the three elements . . . (a) invocation of an FMLA right, (b) termination, and (c) causation." *Lichtenstein*, 691 F.3d at 302. As for interference, Bisher "only needs to show that he was entitled to benefits under the FMLA and that he was denied them." *Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006); *see Ross*, 755 F.3d at 191–92. Because an interference claim does not allege discrimination, the *McConnell Douglas* analysis does not apply to that claim. *Sommer*, 461 F.3d at 399.

Here, Amtrak contends that the Court should address Bisher's FMLA claims together because he pleaded them in the same paragraphs of his Complaint and based them on the same allegation, *i.e.*, that Amtrak knew he had been granted FMLA leave and terminated his employment as a result. Mot. Summ. J. at 42–43 (citing Compl. ¶¶ 50–56). I agree. In *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, the plaintiff claimed that his employer used his FMLA leave as a negative factor in the decision to fire him. 364 F.3d 135, 146–47 (3d Cir. 2004). The Third Circuit treated that claim as a retaliation claim rather than an interference claim. *Id.* at 146–48. District courts in this Circuit have followed this approach when faced with duplicative FMLA retaliation and interference claims. *See, e.g., Woodard v. Scranton Quincy Hosp. Co., LLC*, No. 18-140, 2018 WL 6018902, at *3 (M.D. Pa. Nov. 16, 2018) ("[W]here a plaintiff presents both an interference claim and a retaliation claim on the basis that a defendant took adverse employment action against him because he requested FMLA leave, those claims should be analyzed as a single FMLA retaliation claim.") (citing *Conoshenti*, 364 F.3d at 147); *Atchison v. Sears*, 666 F. Supp. 2d 477, 489 (E.D. Pa. 2009) ("Atchison's interference claim is identical to his retaliation claim, and

premised on the same allegation that Sears took adverse employment action against him because he requested FMLA leave. . . . Thus, Atchison's FMLA violation allegations should be analyzed as a retaliation claim."); *Mascioli v. Arby's Rest. Grp., Inc.*, 610 F. Supp. 2d 419, 433 (W.D. Pa. 2009) ("Since plaintiff's interference claim should be properly characterized as a retaliation claim, the interference claim will be denied as moot in light of the assertion by plaintiff of her retaliation claim."). I will therefore address Bisher's FMLA claims together as alleging retaliation.[7]

In this case, the parties only dispute the causation element of a *prima facie* case. To show causation, Bisher must establish "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). When the "temporal proximity" between the protected activity and adverse action is "unduly suggestive," this alone suffices "to create an inference of causality and defeat summary judgment." *Lichtenstein*, 691 F.3d at 307 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)). "Where the temporal proximity is not 'unusually suggestive,'" the court asks whether "'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *Id.* (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)).

Turning to the first way to show causation, Bisher has not established the requisite unusually suggestive temporal proximity. Amtrak decided to discipline Bisher for multiple

[7] However, even if addressed independently, I can discern no basis on which Bisher could establish a *prima facie* case of FMLA interference because the record shows that on November 13, 2020, Amtrak's Leave Management granted his October 21 FMLA leave request without knowing about his disciplinary history or pending disciplinary hearing. *See* Nov. 13, 2020 FMLA Leave Approval Ltr.; Warner Decl. ¶ 30.

violations of the attendance policy that occurred in September of 2020, before he requested leave. On October 19, 2020, Funk recommended terminating Bisher for violating the attendance policy because he had already received warnings for those violations and continued to accrue occurrences. Funk Decl. ¶ 17; Notice of Intent & Formal Investigation for Termination. At that time, Bisher had not reapplied for FMLA leave that would have covered the September occurrences. Pl.'s Dep. 152:6–8, 154:21–23. Bisher reapplied for FMLA leave *after* receiving notice of those termination proceedings. Oct. 21, 2020 FMLA Leave Req.; Pl.'s Dep. 152:9–11.

Moreover, the record shows that Bisher's termination was based on his attendance policy violations in September 2020, which occurred well before he applied for FMLA leave. Although Bisher's termination was not finalized until after the disciplinary hearing and Superintendent Jerew's ultimate decision in November 2020, the "'wheels of termination' had already been put into motion" before Bisher requested leave. *Reinhart v. Mineral Techs. Inc.*, 05-4203, 2006 WL 4050695, at *13 (E.D. Pa. Nov. 27, 2006); *see, e.g., Burch v. WDAS AM/FM*, No. 00-4852, 2002 WL 1471703, at *4, 10 (E.D. Pa. June 28, 2002) (finding no FMLA retaliation where defendant made initial decision to terminate before plaintiff requested leave); *see Atchison*, 666 F. Supp. 2d at 477, 490–93. *Compare Meigs v. Care Providers Ins. Servs., LLC*, 21-867, 2023 WL 12218676, at *1 n.1 (E.D. Pa. Apr. 11, 2023) (finding genuine dispute of material fact as to the timing of the termination decision without, for example, a memo recommending the plaintiff's discharge or submitting the decision to HR). As such, Bisher cannot establish the necessary temporal link.

Turning to the second way to show causation, Bisher has not presented any evidence of Amtrak's ongoing antagonism towards his use of FMLA leave. As an initial matter, Bisher's arguments flow from the unsupported premise that Amtrak "relaxed" its attendance policy during the COVID-19 pandemic. But the only reasonable interpretation of the record is that the policy

was only relaxed as to COVID-19 cases, which this is not. *See supra* at 4–5. Moreover, the record shows that Amtrak granted every single request he made for intermittent leave, provided he complied with the requirements for making those requests. While "favorable FMLA treatment in the past by no means establishes that a termination is not in retaliation for an FMLA leave request," *Divkovic v. Hershey Co.*, 21-1947, 2025 WL 887770, at *4 (M.D. Pa. Mar. 21, 2025) (citation omitted), this consistent approval over the years certainly bolsters Amtrak's argument that it did not engage in FMLA retaliation when it fired Bisher.

It also bears mentioning that Bisher's immediate supervisor, Therese Drew, encouraged Bisher to cite his FMLA leave when calling off work to avoid accruing occurrences and potential discipline. *See* Drew Email to Bisher; Drew Decl. ¶¶ 5–6. Before Jerew decided to proceed with termination, he confirmed with Leave Management (through Senior Director of Labor Relations Buck) that Bisher did not have FMLA leave at the time of the September 2020 occurrences. Jerew Dep. 19:22–20:17, 27:15–28:7; ECF 28-3, Ex. 13. And Assistant Superintendent Funk, who recommended Bisher's termination to Jerew, explained that while he lamented this outcome, he based his decision on Bisher's disciplinary record and failure to change his behavior despite being given multiple chances to do so. Funk Dep. 43:19–21, 59:1–4, 59:19–23, 60:4–5.

Bisher's other arguments also fall short. He relies on the November 13, 2020 email exchange between Drew and Funk, but that correspondence reflects their frustration as supervisors with Bisher's repeated violations, not bias against employees for seeking leave. Drew's testimony that Bisher would not have been fired had his September 2020 occurrences been covered by approved FMLA leave does not show animus, as Bisher argues. Drew Dep. 95:23–96:6, ECF 28-2, Ex. 4; Pl.'s Opp'n Br. at 7. To the contrary, it underscores that Bisher had an available mechanism for seeking medically necessary leave but failed to comply with Amtrak's system for

securing excused absences. Relatedly, Leave Management's backdating Bisher's final leave request to October 14, 2020, was not retaliatory as Bisher argues. Pl.'s Opp'n Br. at 7–8. Amtrak's policy accommodated for employees who took FMLA leave without prior authorization by providing a two-week "look back" window for certification by a physician. Bisher's attempt to backdate authorization for leave to early September simply fell outside the boundaries of Amtrak's existing policy.[8] Finally, Bisher relies on an Amtrak passenger's email complaining of his termination as evidence that Funk held animus towards him. *See* ECF 28-3, Ex. 18. But that communication, one that makes clear the author's disdain for Funk generally, does not link any animus on the part of Funk to Bisher's use of FMLA, and personal disdain does not support a claim for unlawful discrimination.

On this record, there can be no genuine dispute that Amtrak fired Bisher because of his attendance policy violations and not because of his taking intermittent FMLA leave. Therefore, without any causal connection linking Bisher's use of FMLA leave to his termination in November 2020, Amtrak is entitled to summary judgment on Bisher's FMLA claims.

## IV. Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge

[8] In that regard, it is curious that the September date on the physician's form Bisher submitted was inserted in handwriting over the printed October date.